United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 18, 1996     Decided August 30, 1996

No. 95-5369

FEDERATION FOR AMERICAN IMMIGRATION REFORM, INC.,
APPELLANT

v.

JANET RENO,
ATTORNEY GENERAL OF THE UNITED STATES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 94cv02459)

*William W. Chip* argued the cause for appellant. With him on the briefs was *Kenneth G. Starling.*

*Donald E. Keener*, Deputy Director, United States Department of Justice, argued the cause for appellees. With him on the brief was *Frank W. Hunger*, Assistant Attorney General.

Before: WILLIAMS, GINSBURG and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILLIAMS.

Dissenting Opinion filed by *Circuit Judge* ROGERS.

WILLIAMS, *Circuit Judge*: For decades Cuban citizens have taken dramatic—often fatal—risks to leave Cuba and get to the United States. When the United States rescued them at sea it would routinely "parole" (release) them into the country and issue them work authorization, in contrast to the standard practice under international law of requiring a threshold showing of refugee status. But in August 1994 the Cuban government dropped its policy of forcibly preventing its citizens from emigrating to the United States by boat, and thousands of Cubans seized the opportunity. Our government in turn quickly changed its policy, barring Cubans rescued at sea from entering the United States. Instead they were transported to the Guantanamo Bay Naval Station and other safe havens, where they were held pending further developments.

One month later, in September 1994, both countries again changed their policies, issuing a

Joint Communique Concerning Normalizing Migration Procedures, State Dep't No. 94-232, 1994 WL 621,517. According to the Communique, Cuba agreed "to take effective measures in every way it possibly can to prevent unsafe departures," and the United States agreed to admit at least 20,000 Cubans per year as legal immigrants, not including immediate relatives of United States citizens. Shortly after the signing of the Communique, the Commissioner of the Immigration and Naturalization Service announced that the floor on legal immigration of Cubans would be achieved in part by "paroling" several thousand Cubans into the country each year under § 212(d)(5) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1182(d)(5), and then permitting them to apply for an adjustment of status to that of lawful permanent resident under the Cuban Adjustment Act, Pub. L. No. 89-732, 80 Stat. 1161 (1966) (reproduced as historical note to 8 U.S.C. § 1255).

The Federation for American Immigration Reform filed suit challenging the proposed implementation of the Communique. The Federation is dedicated to "ensuring that levels of legal immigration are consistent with the absorptive capacity of the local areas where immigrants are likely to settle." Brief for Appellant at 6. Its members include approximately 1,400 dues-paying members who live in the Miami area, where many Cuban immigrants have settled in the past. Its complaint alleges that the scheme for parole and adjustment of status of Cuban nationals contravenes various provisions of the INA and other immigration laws, and that such actions will impair the quality of life enjoyed by its members in the Miami area by, for example, diminishing employment opportunities and crowding public schools and other government facilities and services. The district court dismissed the complaint, finding that the Federation failed to establish the "traceability" and "redressability" elements of Article III standing. *Federation for Am. Immigration Reform v. Reno,* 897 F. Supp. 595 (D.D.C. 1995); see *Valley Forge College v. Americans United for the Separation of Church and State,* 454 U.S. 464, 472 (1982).

On appeal, the government argues, as it did in district court, that the Federation's challenge presents nonjusticiable political questions and that the Federation lacks constitutional and prudential standing. Because we find that the Federation lacks prudential standing, we need not consider the issue of constitutional standing or the political question doctrine.

\* \* \*

Standing of an association as a representative of members requires that at least some of the members would have standing to sue in their own right, and also that the interests the association seeks to advance are germane to its purposes and that neither its claim nor the relief requested is such as to require participation in the suit by individual members. *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.,* 116 S. Ct. 1529, 1534 (1996); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977). Neither of the latter (association-specific) requirements is in question here, so the Federation has standing if some of its members would.

The Federation brought its challenge under § 10(a) of the Administrative Procedure Act, which allows standing for one "aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; see also *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153 (1970). A party meets that standard if it is "arguably within the zone of interests" that Congress sought to protect or regulate under the statute in question. *Data Processing*, 397 U.S. at 153. As the Federation's members are not regulated by the immigration provisions it believes the government has violated, its claim necessarily rests on the idea that its members' interests are among those Congress sought to protect. In light of the Supreme Court's decision in *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388 (1987), we have viewed parties as showing a protected interest if either they were intended by Congress as "beneficiaries" of the statute or we could infer that Congress intended them as a "suitable challenger." *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 283 (D.C. Cir. 1988). To qualify as the latter, a party must show "less than an intent to benefit but more than a "marginal[ ] rela[tionship]' to the statutory purposes." *Id*. (quoting *Clarke*, 479 U.S. at 399).

The Federation's complaint alleges violations of several statutory provisions. Its primary claim is that the scheme for parole and adjustment of Cuban nationals is inconsistent with the temporal limits on the parole authority granted to the Attorney General under 8 U.S.C. § 1182(d)(5)(a):

> The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of

> the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

*Id.* The Federation contends, as we understand it, that the Attorney General's treatment of the Cuban nationals violates the statute's mandate that parole "shall not be regarded as an admission of the alien." The Federation also argues that the adjustment of the Cubans' status to that of lawful permanent resident violates 8 U.S.C. § 1254a(g), which says that certain provisions by which the Attorney General may permit aliens to remain in the United States temporarily because of their nationality are the exclusive means to that end. It further claims that the parole and adjustment scheme has the effect of discriminating on the basis of nationality in the issuance of immigrant visas in violation of 8 U.S.C. § 1152(a)(1). Finally, it says that the adjustment of paroled Cubans to the status of immigrants lawfully admitted for permanent residence violates § 1 of the Cuban Adjustment Act of 1966, as amended (reproduced as historical note to 8 U.S.C. § 1255), because the paroled individuals do not satisfy its requirement that they be eligible to receive immigrant visas.

The Federation's theory of injury—which we assume to have satisfied the demands of constitutional standing—is that a rush of immigrants adversely affects the welfare of the Federation's members by generating unemployment and wage reductions and by placing burdens on public services such as hospitals and schools, especially in the Miami area. But cf. David Card, "The Impact of the Mariel Boatlift on the Miami Labor Market," 43 *Indus. & Lab. Rel. Rev.* 245, 250 (1990) (finding no effect on non-Cuban residents' wages from the influx of 125,000 "Mariel" Cubans in 1980). As to prudential standing, the Federation's idea is that because congressional limitations on immigration reflect concern over just such effects, the interests of Federation members must be within the zone of interests sought to be protected. The Federation presents two facets of the argument, one framed in nationwide terms and the other region-specific—focused on the Miami area, which has absorbed large numbers of Cuban immigrants over the past two decades. We turn to the latter argument first.

*Interest in Limiting Immigration to Impacted Regions.*

The Federation argues that "it would be hard to imagine for whose benefit Congress imposed

the INA's limitations if not for the benefit of persons living in the localities where immigrants would settle if allowed to immigrate, notably the [Miami area] in the case of immigration from Cuba." The problem with this argument is that the Federation has pointed to neither language in the statutes on which it relies (8 U.S.C. §§ 1152, 1182, and 1254a and the Cuban Adjustment Act) nor, with the trivial exceptions discussed just below, legislative history that even hints at a concern about regional impact. And intent to protect residents of impacted regions does not appear so plausible from the statute itself that we will infer it without more.

Of the various pieces of legislative history cited by the Federation, only two brief passages allude to regional (as opposed to national) effects of immigration at all. One passage, contained in a Senate Report on the Immigration Reform and Control Act of 1986, mentions regional effects in a general discussion of various "current problems" related to that act, which itself is not the source of any of the Federation's claims. The relevant passage in the report reads in full:

> [National immigration] figures actually underestimate the impact of immigration. Since it is concentrated in only a few regions of the country, the impact on these regions is of much greater significance than the overall figure suggests. For example, ... assuming continuance of existing settlement patterns, the population of California would double by 2080. Over one-half of that State's population would consist of post-1980 immigrants and their descendants.

S. Rep. No. 132, 99th Cong., 1st Sess. 5 (1985). The Federation's second passage concerning regional effects is also drawn from the legislative history of the 1986 Act and this time involves a funding provision of that act (again, not connected in any way to the provisions invoked by the Federation) under which the federal government was to provide partial reimbursement of costs incurred by states due to participation of "legalized" aliens (presumably those legalized by the Act) in various public programs. H.R. Conf. Rep. No. 1000, 99th Cong., 2d Sess. 93 (1986). The passage notes that funds were authorized to be used for "programs of public assistance, programs of public health assistance, and services provided by local educational agencies." *Id.* These brief references to regional effects do little to establish that individuals living in immigration-impacted areas are either beneficiaries of, or otherwise suitable challengers under, the apparently unrelated statutory provisions that the Federation claims the government violated here.

*General Interest in Limiting Immigration.*

Another possibility is that the zone of interests protected by the statutory provisions invoked in the complaint includes the interest that legal residents throughout the United States may have in preventing immigration-related unemployment and stresses on the provision of government services. But the widespread nature of this alleged interest, indeed its near universality, suggests to us a negative answer to *Clarke*'s question whether Congress intended that persons having the interest should be "heard to complain" in federal court of alleged interferences with it. 479 U.S. at 399. The injury (if any) to a citizen qua citizen from admission of an alien is an injury common to the entire population, and for that reason seems particularly well-suited for redress in the political rather than the judicial sphere. Small-scale violations of the law are unlikely to do much harm, and large-scale ones are likely to be picked up by the political process. As the Supreme Court said in *Warth v. Seldin,* 422 U.S. 490, 498 (1975), "In essence the question of standing is whether the litigant is entitled to have the *court* decide the merits of the dispute or of particular issues.... In both [its constitutional and its prudential] dimensions [standing doctrine] is founded in concern about the proper—and properly limited—role of the courts in a democratic society." (Emphasis added.) See also *id*. at 508 n.18 ("[C]itizens dissatisfied with provisions of [particular] laws need not overlook the availability of the normal democratic process.") Where the question is whether Congress intended to grant a right to a particular class of individuals to enforce a statute or other provision of law in federal court, the near-universality of the class at least hints at a negative answer.

This is of course not to say that Congress is *unable* to enact statutes enforceable by any member of the public. As long as the requirements for Article III standing are met, Congress may permit suit by persons who would otherwise be barred by prudential standing requirements. *Warth,* 422 U.S. at 501. And, although the Article III requirements will *not* be met if the alleged injury is to an abstract or generalized interest, such as the interest in the proper operation of government, see *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573 (1992); *Allen v. Wright,* 468 U.S. 737, 760 (1984), they may be satisfied even though the alleged injury is widespread or universal, so long as it is concrete, see *United States v. Students Challenging Regulatory Agency Procedures* ("*SCRAP*"), 412 U.S. 669, 686-88 (1973). The question under the zone-of-interests test of § 702 is simply

whether the language of the statutes invoked by the plaintiff or the supporting legislative history suggests a congressional intent to permit the plaintiff's suit.

Apart from the near-universal character of the asserted interest of citizens qua citizens in assuring that employment opportunities are not impaired and public services and facilities not overburdened, we see little that pushes us one way or the other in discerning whether Congress intended to permit suit by members of this broad class. As the Federation's counsel stated in oral argument, "[i]f it is not to protect the people who live in the few communities where immigrants tend to settle, it would be hard to know for whose benefit those limitations were enacted, *because Congress never mentions anybody else.*" (Emphasis added). We have already seen that Congress failed to mention citizens living in immigration-impacted areas in any relevant connection, so we are left facing something of a vacuum. We do not believe that an affirmative signal of Congressional intent to permit a suit is *required* for a finding of prudential standing; a different conclusion would be difficult to reconcile with the Court's statement in *Clarke* that "[t]he [zone-of-interests] test is not meant to be especially demanding; in particular, there need be *no indication of congressional purpose to benefit* the would-be plaintiff." 479 U.S. at 399-400 (emphasis added). But we have also held that the absence of a clear indication of congressional intent to *forbid* the suit does not automatically confer standing on the plaintiff. *National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1052 (D.C. Cir. 1989) (explicitly rejecting idea that parties "have standing unless the statutes or their legislative histories reveal a congressional intent to preclude reliance on this particular class of plaintiffs").

The immigration context suggests the comparative improbability of any congressional intent to embrace as suitable challengers in court all who successfully identify themselves as likely to suffer from the generic negative features of immigration. If it were likely that the Immigration and Naturalization Service might be subjected to acute pressure from powerful pro-immigration interest groups, a congressional contemplation of universal litigative champions would perhaps be a likely inference. But in fact the people most directly affected by the agency's behavior, the would-be immigrants, are exceptionally ill-placed to mount such pressures. Environmental legislation is a sharp

contrast. Although it often has champions who have near-universal interests (breathing clean air, for example), it also works in an area with obvious and powerful domestic interest groups, the regulated firms, which Congress might fear as a source of distorting influence over the relevant agencies. In that context, the inference that Congress contemplated universal champions seems far more reasonable.

Moreover, we do not understand the Federation's concept of its members' injury to be at all analogous to the injury suffered by a broad public as a result of an increase in air pollution—each extra particle (or alien) causing a marginal increase in hazard. The Federation makes no such zenophobic suggestion, which in any event we would be most reluctant to impute to Congress as the injury it sought to avert (and thus the obverse of the interest to be protected). Rather, the injury asserted appears no different from the crowding effect that might be expected from any abrupt surge in the adult population. And under that view the injury is as diffuse as can be imagined. It is, for example, suffered even by those Cuban immigrants who would secure entrance to the United States if the program attacked by the Federation were dismantled. The asserted injury is thus borderless and universal in a way that even environmental injury is not.

Here, without either a clear indication of congressional intent or any obvious tie-breaking rule, we infer from the universality of the proposed class of plaintiffs and the above characteristics of the immigration context that Congress did not intend to permit suit in federal court by all members of the proposed class.

*Employment-based Interest in Limiting Immigration.*

In *International Union of Bricklayers & Allied Craftsmen v. Meese,* 761 F.2d 798 (D.C. Cir. 1985), we held that domestic workers fell within the zone of interests of INA § 212(a)(4), 8 U.S.C. § 1182(a)(14), which specifically excluded from the United States "alien workers whose entry "will ... adversely affect the wages and working conditions of the workers in the United States similarly employed.' " *Bricklayers,* 761 F.2d at 804 (quoting 8 U.S.C. § 1182(a)(14)). The Federation suggests, as an alternative to its primary arguments, that under *Bricklayers* a narrowed class of prospective plaintiffs, including only those persons for whom more immigration may imply a prospect

of increased competition in the job market—and thus a lower wage or an increased risk of unemployment—falls within the zone of interests of the statutory provisions named in the complaint.

The INA contains various numerical limits on immigration. E.g., 8 U.S.C. § 1153. At least in some instances, these limits reflect a clear concern about protecting the job opportunities of United States citizens. A clear example is § 1153(b)(3)(A), which restricts visas for various types of workers to individuals capable of performing work for which "qualified workers are not available in the United States." Assuming that the Federation's members fall within the zone of interests of the numerical limit provisions, and thus would have prudential standing to complain of *direct* violations of those provisions, it does not follow that they have standing to complain about violations of the statutory provisions they in fact assert. See *National Wildlife Fed'n,* 497 U.S. at 883.[1] If a plaintiff were permitted to bring a claim for violation of a particular statutory provision whenever he or she came within the zone of interests of *some* provision contained within the same act, the zone-of-interests test could be "deprive[d] ... of virtually all meaning." *Air Courier Conference of Am. v. American Postal Workers Union,* 498 U.S. 517, 529-30 (1991).

In applying the zone-of-interests test, we do not look at the specific provision said to have been violated in complete isolation. In *Clarke* the Court looked not only to the provision allegedly violated but also to one to which it was an exception. 479 U.S. at 401-02. And in *Bricklayers* we found that labor unions had standing to challenge the admission of aliens classified as "B-1's" on the ground that their admission violated the limits on use of "H-2" visas, where both of the relevant statutory provisions appeared in a common subsection of the INA, § 101(a)(15), and concerned the same subject matter, entry specially for work purposes. 761 F.2d at 804-05. But in *Air Courier* the Supreme Court emphasized that it would look only to provisions having an "integral relationship" with the provisions under which the suit was brought. 498 U.S. at 530. It thus refused to permit labor unions to challenge the "Postal Express Statutes" (governing use of private mailing services) on the basis of certain labor-management provisions—within whose zone of interests the unions

---

[1] The Federation's complaint does refer to (unspecified) "numerical limits" on immigration, but we do not read the complaint to allege a claim for relief for violation of § 1153 or any similar provision.

presumably fell—contained in the same piece of legislation, the Postal Reorganization Act. *Id.* "None of the documents constituting the [Act's] legislative history suggest that those concerned with postal reforms saw any connection between the [Postal Express Statutes] and the provisions of the [Act] dealing with labor-management relations." *Id.*

The numerical limits in the INA do not seem to have the sort of "integral relationship" with the parole, nationality-preference, and visa-eligibility provisions invoked by the Federation that would permit the numerical limits to be considered in establishing standing for the Federation's members. Of course every immigration provision is in a broad sense part of the framework of every other provision. But if that were enough, then *every* provision constraining the admission of anyone under any circumstances (including any provision *allowing* the admission of anyone, for all such permissive provisions necessarily have their limits) would be pertinent in applying the zone-of-interests test to *any* provision. This does not seem the sort of relationship the Supreme Court had in mind in *Air Courier*.

* * *

Because Congress, in the various immigration provisions that the Federation says have been violated, did not seek to protect the interests of the Federation's members by intending them as beneficiaries or as suitable challengers of violations, the judgment dismissing the complaint is

*Affirmed*.


ROGERS, Circuit Judge, *dissenting*: The Federation for American Immigration Reform, Inc. ("FAIR") has brought suit in federal district court seeking declaratory and injunctive relief for alleged violations of the Immigration and Nationality Act ("INA") by the Attorney General. In accordance with a joint communiqué issued by the governments of the United States and Cuba on September 9, 1994, the Attorney General announced a policy of paroling a substantial number of Cubans into the United States each year and, after one year's presence in the United States, adjusting their status to

permanent residents.[1] FAIR's complaint alleges that the Attorney General's parole program for special Cuban migrants exceeds her authority under the parole provision, INA § 212(d)(5)(A), 8 U.S.C. § 1152(d)(5)(A) (1994), the Cuban Adjustment Act, Pub. L. No. 89-732, § 1, 80 Stat. 1161, 1161 (1966), *as amended by* Pub. L. No. 96-212, § 203(i), 94 Stat. 102, 108 (1980), *reprinted as* 8 U.S.C. § 1255 note (1994), and several other provisions of the INA.  The court concludes that FAIR's members are not within the "zone of interests" of the immigration statutes and affirms the dismissal of the complaint.  Because I conclude that FAIR has standing and its complaint does not present a non-justiciable political question, I respectfully dissent.

## I.

**Prudential standing.**  In its complaint, FAIR asserts that the limits on immigration in the INA "were enacted by Congress to protect U.S. citizens and previously admitted immigrants from the adverse effects of immigration in excess of the absorptive capacity of the nation and of the communities where the immigrants settle."  Cmplt. ¶ 26.  Viewing the question as "whether the language of the statutes invoked by the plaintiff or the supporting legislative history suggests a congressional intent to permit the plaintiff's suit," Majority Opinion ("Maj. Op.") at 8, the court "see[s] little that pushes us one way or the other in discerning whether Congress intended to permit suit by members of this broad class." Maj. Op. at 8.  The court concludes that the "near-universality" of the injury operates as a "tie-breaking rule" indicating that FAIR's members are not within the zone of interests.  Maj. Op. at 10.  In conducting the zone-of-interests inquiry in this manner, the court ignores express instruction from the Supreme Court and fashions a new standard without any previous support.

In *Clarke v. Securities Industries Association,* 479 U.S. 388, 399-400 (1987), the Court articulated the zone-of-interests test in the following terms:

---

[1] The United States government has undertaken in its agreement with Cuba to admit a minimum of 20,000 Cubans into the United States each year, not including immediate relatives of United States citizens.  The government has estimated that about 3,000 Cuban migrants would arrive as immigrants, about 7,000 as refugees, and about 10,000 as parolees.  Statement of Doris Meissner, Commissioner of the Immigration and Naturalization Serv., transcript at 15 (Sep. 9, 1994).

> The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right to review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

In an accompanying footnote, the Supreme Court declared that the approach taken by the D.C. Circuit in *Control Data Corp. v. Baldridge,* 655 F.2d 283, 293-95 (D.C. Cir.), *cert. denied,* 454 U.S. 881 (1981) (requiring a positive showing, albeit only "slight," of congressional intent to benefit the class of which the plaintiff is a member), was "inconsistent with our understanding of the "zone of interest' test, as now formulated." 479 U.S. at 400 n.15. As the court notes, Maj. Op. at 8-9, the presumption of reviewability of agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), can be overcome not only by express statement in the statute or its legislative history that Congress did not intend to permit suit by a particular class of plaintiffs, but also if the plaintiff's interest is "in fact inconsistent with the animating purpose" of the statute. *National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1043-44 (D.C. Cir. 1989), *cert. denied,* 496 U.S. 936 (1990). On the other hand, if the plaintiff is a "suitable challenger" in the sense that its "interests, while not in any specific or obvious sense among those Congress intended to protect, coincide with the protected interests," then the plaintiff is permitted to bring suit. *Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 922-23 (D.C. Cir. 1989).

The issue is whether FAIR falls within the zone of interests of the limitations on the Attorney General's authority to grant parole, not the zone of interests of the permissive aspect of the parole authority. When a plaintiff "challenge[s] [a] program as *ultra vires,*" the court should ask whether the "statutory provision was intended to protect persons like the litigant by limiting the authority conferred. If so, the litigant's interest may be said to fall within the zone protected by the limitation." *Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 811 n.14 (opinion of Bork, J.). The INA imposes limits on the overall number as well as on the characteristics of immigrants to the United States. INA §§ 201-203, 8 U.S.C. §§ 1151-1153 (1994). When the parole provision was first adopted in 1952,

the Report of the House Committee on the Judiciary explained that the INA established "strict qualitative tests" for admission, and "any discretionary authority to waive the grounds for exclusion [by parole] should be carefully restricted to those cases where extenuating circumstances clearly require such action and ... the discretionary authority should be surrounded with strict limitations." H.R. REP. NO. 1365, 82d Cong., 2d Sess. 51, *reprinted in* 1952 U.S.C.C.A.N. 1653, 1705. In other words, the "strict limitations" on the Attorney General's parole authority implement the INA's overall limits on immigration.[2]

When Congress abolished the national quota system in 1965 and set an overall numerical limitation on immigration, with a system of "preferences" for immigrants meeting certain qualifications, the Report of the Senate Committee on the Judiciary explained that the "limit will permit immigration within what is believed to be the present absorptive capacity of this country." S. REP. NO. 748, 89th Cong., 1st Sess. 14, *reprinted in* 1965 U.S.C.C.A.N. 3328, 3332. These limits on immigration are obviously intended to benefit current residents of the United States. *Cf.* S. REP. NO. 132, 99th Cong., 1st Sess. 3 (1985) ("[W]e believe that the formulation of U.S. immigration policy must involve a judgment of what would promote the interests of American citizens...."). Congress has arrived at these limits on immigration by weighing "both the economic and noneconomic impacts of immigration." *Id.* at 4.[3]

The court does not explain why FAIR would not be a "suitable challenger" to bring a claim

---

[2] The court concludes, Maj. Op. at 10-12, that the parole provision does not have an "integral relationship" with the limitations on immigration in INA §§ 201-203, 8 U.S.C. §§ 1151-1153. *Cf. Air Courier Conference v. American Postal Workers Union,* 498 U.S. 517, 530 (1991). I agree that it does not avail FAIR to be within the zone of interest for specific limitations on immigration that are not at issue, such as the limits on immigrants capable of performing labor for which qualified workers are unavailable in the United States, INA § 203(b)(3), 8 U.S.C. § 1153(b)(3). On the other hand, the Attorney General's parole authority does bear an "integral relationship" to the limitations on immigration as a whole. Just as in *Clarke,* in which the section of the statute under which the plaintiff sought relief was "a limited exception to the otherwise applicable requirement" of another section of the statute, 479 U.S. at 401, the Attorney General's parole authority is a limited exception to the general restrictions on immigration.

[3] Senate Report No. 132 accompanied the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359. The quoted passages can also be found in identical form in a Senate report from the previous Congress accompanying a similar bill that was not enacted into law. S. REP. NO. 62, 98th Cong., 1st Sess. 3-4 (1983).

that the Attorney General has acted beyond her parole authority. FAIR's interest in limiting immigration so as to prevent what it considers to be the adverse economic impacts of immigration coincides with one of Congress' implicit purposes in enacting limitations on the Attorney General's parole authority. Hence, FAIR's interest is not "marginally related to or inconsistent with the purposes implicit in the statute." *Clarke,* 479 U.S. at 399.

The court provides no authority for its proposition that the "near-universal character of [an] asserted interest" overcomes the presumption of reviewability under the APA. Maj. Op. at 8. As the court acknowledges, Maj. Op. at 7, FAIR does not present a mere generalized grievance, "claiming only harm to [its] and every citizen's interest in proper application of the ... laws." *Lujan v. Defenders of Wildlife,* 504 U.S. at 573; *see also Warth v. Seldin,* 422 U.S. 490, 499 (1975). Rather, FAIR alleges imminent injury to its members' concrete and particularized interest in job opportunities and local public services. *See infra* Part II. Although FAIR's members' injury-in-fact is particular, FAIR's asserted legal interest is general—indeed, everyone resident in the United States is protected by the INA from what Congress considers to be the harms from over-immigration. In the same manner, everyone is protected by laws governing the preservation of national parks, only those persons concretely affected by the over-development of such a park suffer the injury-in-fact necessary for constitutional standing.[4] *See, e.g., Sierra Club v. Morton,* 405 U.S. 727 (1972). To take other examples, the legal interest of groups like voters and television viewers are similarly held by almost the entire populace, yet such groups are within the zone of interests of certain statutes. *See, e.g., Office of Communication of the United Church of Christ v. FCC,* 359 F.2d 994 (D.C. Cir. 1966). "[T]he fact of [injury-in-fact] is what gives a person standing to seek judicial review under the statute, but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate." *Sierra Club,* 405 U.S. at 737.

---

[4] The court distinguishes the application of the zone-of-interests test to environmental statutes on the ground that anti-conservation groups are politically more powerful than pro-immigration groups. Maj. Op. at 9. Standing to sue, however, does not depend on the likelihood of agency "capture" by opposed interest groups. FAIR's members fall within the zone of interests of the limitations on the Attorney General's parole authority regardless whether she acts out of her sense of the public interest or at the behest of interest groups favoring Cuban immigration.

There appears no reason to conclude from the generality of the legal interest that FAIR asserts that FAIR's members do not fall within the relevant zone of interest.

## II.

I address briefly the defendants' remaining arguments for why FAIR's claims are non-justiciable, which rely on constitutional standing concerns and the political-question doctrine.[5]

**Constitutional standing.** A plaintiff presents a justiciable "case or controversy" under Article III only if the plaintiff meets three constitutional standing requirements. First, the plaintiff's "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; second, that injury must be fairly traceable to the defendant's conduct; and third, the judicial relief requested must be likely to redress the injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted).

FAIR alleges in its complaint that, according to INS statistics, 75% of Cuban immigrants in 1991 to 1993 stated that they intended to settle in the Miami area. FAIR recites that, between 1970 and 1990, the foreign-born population of the Miami area increased by 568,000, whereas the native-born population increased by only 100,000. Based on the experiences of FAIR's members with past immigration, FAIR contends that its members who reside in the Miami area will suffer harm in four respects: (1) their children's public schools will become even more overcrowded; (2) local public medical facilities will become even less efficient and accessible; (3) local police protection will be even further diluted; and (4) employment opportunities will be even further diminished. In each instance, FAIR has provided specific examples of alleged injuries of this nature suffered by its members.

---

[5] In addition, the defendants contend that the federal courts lack jurisdiction over FAIR's claims because they fall within the exceptions to judicial reviewability under § 10 of the APA for when "statutes preclude judicial review" and when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Reviewability under the APA is generally not a jurisdictional matter but rather a question of "[w]hether a cause of action exists." *Air Courier Conference v. American Postal Workers Union,* 498 U.S. 517, 523 n.3 (1991). The district court granted the defendants' motion to dismiss for lack of jurisdiction under Rule of Civil Procedure 12(b)(1) and denied as moot defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6). In this dissenting opinion I need address the issue of standards permitting judicial review only in connection with the political question doctrine. *See infra.*

At the pleading stage, FAIR has sufficiently alleged injury in fact.[6] *See Lujan v. Defenders of Wildlife,* 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice...."). Its claimed injuries are quite concrete, and they are particularized because they are confined to the Miami area. Although FAIR's allegations of injury draw on experience from past Cuban migration, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton,* 414 U.S. 488, 496 (1974); *see also International Union of Bricklayers & Allied Craftsmen v. Meese,* 761 F.2d 798, 803 (D.C. Cir. 1985). Of course, the alleged injuries to the Miami area from the special Cuban migrant program may never occur, *cf.* David Card, *The Impact of the Mariel Boatlift on the Miami Labor Market,* 43 INDUS. & LAB. REL. REV. 245 (1990), and the defendants may contest FAIR's showing of injury in fact at the summary-judgment stage.[7]

The district court concluded that FAIR could establish neither causation nor redressability. First, the court reasoned that "[t]here are simply too many independent variables in the chain of causation linking defendants' actions with plaintiff's injuries." *Federation of Am. Immigration Reform v. Reno,* 897 F. Supp. 595, 604 (D.D.C. 1995). The court pointed in particular to the uncertainty whether the Cuban migrants will choose to settle in the Miami area and to the possibility that "plaintiff's injuries could be abated by actions of the political branches of the Florida government." *Id.* Second, the court denied that the relief sought would redress FAIR's members' injuries because the defendants could admit the Cuban migrants into the United States through alternative methods that would result in the same injuries. Alternatively, if the defendants were unable to fulfill their obligations under the joint communiqué, the Cuban government might react by lifting emigration restrictions, which could potentially result in even greater injury to FAIR's members. *Id.* at 605.

---

[6] The defendants maintain, citing *Tennessee Power Co. v. TVA,* 306 U.S. 118, 137 (1938), that the injuries suffered by FAIR's members are not legally cognizable. The legal-interest test, however, was laid to rest by the Supreme Court in 1970. *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153 (1970).

[7] The defendants assert that the parolees in the Cuban parole program will have different characteristics from past Cuban immigrants. If that is so, the defendants will have the opportunity to establish that fact at summary judgment.

In deciding whether the injury caused by the migration of Cubans to the Miami area is fairly traceable to the defendants' actions, the court must ask whether "the third party's conduct is sufficiently dependent upon the incentives provided by the defendant's action." *Wilderness Soc'y v. Griles,* 824 F.2d 4, 17 (D.C. Cir. 1987). When a defendant's action is "the primary factor enabling" the third-party action harmful to the plaintiff, the causation element of standing is satisfied.[8] *Id.* Under *Griles,* the defendants' (allegedly unlawful) admission of the special Cuban migrants into the United States is the "primary factor enabling" them to settle in the Miami area: without the defendants' actions, none of the special Cuban migrants would enter the country.[9] The speculative possibility that local governments might alleviate the injuries to FAIR's members is not germane to the standing inquiry; FAIR's chain of causation does not rely upon any actions to be taken by local governments, and FAIR is not required "to negate the kind of speculative and hypothetical possibilities suggested." *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 78 (1978).

FAIR also satisfies the redressability element of standing. The defendants now contend, curiously, that declaratory and injunctive relief against the Cuban parole program would be ineffectual because the government could simply admit the Cuban migrants through alternative, lawful means. By contrast, the Principal Deputy Assistant Secretary of State for Inter-American Affairs, declared under penalty of perjury to the district court that "[w]ithout the use of section 212(d)(5)(A) of the

---

[8] The district court relied on our decision in *Von Aulock v. Smith,* 720 F.2d 176, 180-85 (D.C. Cir. 1983). In that case, the court denied standing because it concluded that third parties would have taken the identical actions regardless of the defendant's conduct. *Von Aulock* is distinguishable because the special Cuban migrants would not enter the United States but for the defendants' parole program.

[9] Recently, in *Florida Audubon Society v. Rubin,* __ F.3d ___, (No. 94-5178, D.C. Cir. Aug. 20, 1996, in banc), in which the plaintiffs sought to set aside a rulemaking granting a tax credit to a certain ethanol-fuel mixture because the Secretary of the Treasury prepared an environmental impact statement assertedly required under the National Environmental Policy Act of 1969, the court concluded that the plaintiffs lacked standing "both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury." Assuming the validity of the court's conclusion in that case, *but see id.* at 1 (Rogers, J., dissenting), however, the causal relationship that FAIR alleges is more direct than in the case of a tax incentive, and the pattern of past Cuban migration to the Miami area makes it highly likely that many of the special Cuban migrants will settle there. Furthermore, the instant case remains at the pleading stage.

INA, it would be virtually impossible for the United States to comply with its legal obligations under the September 9 migration agreement." Declaration of Michael Skol ¶ 10 (Jan. 30, 1995). In its complaint, FAIR alleges that "the Defendants cannot lawfully admit [the special Cuban migrants] into the United States." Cmplt. ¶ 38. Because, the court must accept FAIR's allegations as true, *Warth v. Seldin,* 422 U.S. 490, 501 (1975), and the defendants identify no alternative legal procedure for admitting the special Cuban migrants, FAIR's members' alleged injuries are redressable by the judicial relief that FAIR requests. The defendants' assertion that judicial relief would be unavailing because the Cuban government would take actions that would lead to even larger numbers of Cubans coming to the United States is speculative and is belied by current United States policy, which is to interdict Cuban refugees at sea and not allow them to enter the United States. *See* The President's News Conference (Aug. 19, 1994), 30 WEEKLY COMP. PRES. DOCS. 1682, 1683 (Aug. 22, 1994).

**Political question doctrine.** To identify non-justiciable political questions, the court must ask:

> "(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?"

*Ramirez v. Arellano v. Weinberger,* 745 F.2d 1500, 1511 (D.C. Cir. 1984) (en banc) (quoting *Goldwater v. Carter,* 444 U.S. 996, 998 (Powell, J., concurring in the judgment)); *see also Baker v. Carr,* 369 U.S. 186, 217 (1962).

The sensitive immigration context in which FAIR's claims arise counsels caution, but not complete judicial abnegation of jurisdiction. There is no "textually demonstrable constitutional commitment of the issue to a coordinate political department," as would be required to conclude that FAIR's complaint presented a political question. *Baker v. Carr,* 369 U.S. at 217. As this court stated in *Abourezk v. Reagan,* 785 F.2d 1043, 1061 (D.C. Cir. 1986), *aff'd,* 484 U.S. 1 (1987):

> The Executive has broad discretion over the admission and exclusion of aliens, but that discretion is not boundless. It extends only as far as the statutory authority conferred by Congress and may not transgress constitutional limitations. It is the duty of the courts, in cases properly before them, to say where those statutory and constitutional boundaries lie.

*See also Ukrainian-American Bar Ass'n, Inc. v. Baker,* 893 F.2d 1374, 1380 (D.C. Cir. 1990)

(concluding that a First Amendment challenge to the government's asylum procedures did not present a political question). Despite the sovereign character of immigration decisions, *see Fiallo v. Bell,* 430 U.S. 787, 792 (1977), they are subject to judicial review.

The district court ruled correctly that FAIR's claims did not present a non-justiciable political question. 897 F. Supp. at 601-03. As the district court noted, the Supreme Court's decision in *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221 (1986), "is remarkably similar to the instant case." 897 F. Supp. at 603. In *Japan Whaling,* the United States entered into an executive agreement with the government of Japan regarding whale-harvesting quotas, and the plaintiffs challenged the Secretary of Commerce's failure to "certify" Japan under a statute providing for penalties against nations that did not comply with more restrictive quotas. The Supreme Court rejected the government's contention that the case presented a political question, stating that "the challenge to the Secretary's decision not to certify Japan ... presents a purely legal question of statutory interpretation." 478 U.S. at 230. The plaintiffs in both cases claim that the Executive Branch, pursuant to an executive agreement with a foreign nation, violated a congressional statute.[10] The interpretation of § 212(d)(5)(A) of the INA is well within the area of judicial expertise.

Because FAIR's complaint raises only statutory questions, there are "judicially discoverable and manageable standards for resolving it," *Baker,* 369 U.S. at 217, in the text of the statute itself, as well as in accompanying regulations adopted by the Attorney General, 8 C.F.R. § 212.5 (1996). Admittedly, the scope of judicial review is limited: "The unusually broad Congressional power over the admission of aliens into the United States is reflected in the narrow construction by courts of their own power to review the discretionary decisions of the Attorney General made pursuant to authority delegated to him [or her] by Congress." *Bertrand v. Silva,* 684 F.2d 204, 212 (2d Cir. 1982); *see also Jean v. Nelson,* 727 F.2d 957, 976-77 (11th Cir. 1984) (en banc), *aff'd on other grounds,* 472 U.S. 846 (1985). But even though "the Attorney General has broad discretion to grant or deny

---

[10] The defendants attempt to distinguish *Japan Whaling* on the ground that the plaintiffs in that case sought a writ of mandamus, whereas FAIR seeks a prohibitory injunction under the APA. This is a distinction without significance, as far as the political question doctrine goes; if anything, the less intrusive nature of the relief that FAIR seeks makes its claims even less problematic.

parole," that discretion "is not unlimited." *Moret v. Karn,* 746 F.2d 989, 991 (3d Cir. 1984). Therefore, FAIR's complaint does not present any non-justiciable political questions.

    Accordingly, I would reverse and remand the case to the district court.

<<The pagination in this PDF may not match the actual pagination in the printed slip opinion>>
USCA Case #95-5369    Document #220758    Filed: 08/30/1996    Page 20 of 20